1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | | |
|---|---|---|
| John James III, | ) | No. CV 07-880-TUC-RCC |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| A.K. Scribner, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Pending before the Court is Defendant's Motion for Summary Judgment.  Upon reviewing the parties briefings, exhibits, and relevant case law, the Court will grant Defendant's Motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

1    U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will

2    bear the burden of proof at trial on a dispositive issue, a summary judgment motion may

3    properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories,

4    and admissions on file.'" *Id.* at 324. Indeed, summary judgment should be entered, after

5    adequate time for discovery and upon motion, against a party who fails to make a showing

6    sufficient to establish the existence of an element essential to that party's case, and on which

7    that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof

8    concerning an essential element of the nonmoving party's case necessarily renders all other

9    facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long

10   as whatever is before the district court demonstrates that the standard for entry of summary

11   judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

12        If the moving party meets its initial responsibility, the burden then shifts to the

13   opposing party to establish that a genuine dispute as to any material fact actually does exist.

14   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89

15   L.Ed.2d 538 (1986).

16        In attempting to establish the existence of this factual dispute, the opposing party may

17   not rely upon the denials of its pleadings, but is required to tender evidence of specific facts

18   in the form of affidavits, and/or admissible discovery material, in support of its contention

19   that the dispute exists. Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 586 n. 11. The opposing

20   party must demonstrate that the fact in contention is material, i.e., a fact that might affect the

21   outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

22   248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust &*

23   *Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir.2002); *T.W. Elec. Serv., Inc. v. Pacific Elec.*

24   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the

25   evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Long*

26   *v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.2006); *Wool v. Tandem Computers*,

27   *Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987).

28        In the endeavor to establish the existence of a factual dispute, the opposing party need

1  not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed

2  factual dispute be shown to require a jury or judge to resolve the parties' differing versions

3  of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary

4  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is

5  a genuine need for trial.' " *Matsushita*, 475 U .S. at 587 (quoting former Rule 56(e) advisory

6  committee's note on 1963 amendments).

7  In resolving a motion for summary judgment, the court examines the pleadings,

8  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

9  if any. Fed.R.Civ.P. 56(c). The evidence of the opposing party is to be believed, *Anderson*,

10  477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before

11  the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (*citing*

12  *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per

13  curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

14  obligation to produce a factual predicate from which an inference may be drawn. *Richards*

15  *v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898,

16  902 (9th Cir.1987).

17  Finally, to demonstrate a genuine dispute, the opposing party "must do more than

18  simply show that there is some metaphysical doubt as to the material facts....Where the

19  record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

20  there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 586–87 (citations omitted).

21  **UNDISPUTED FACTS**

22  At all times relevant to this action, Plaintiff John James was a state prisoner in the

23  custody of the California Department of Corrections and Rehabilitation (CDCR) at California

24  State Prison, Corcoran (CSP-COR).

25  On June 20, 2005 the following CSP-COR employees were on duty during second

26  watch: Correctional Officer Athey (control booth officer of  bldg. 3C-01); Correctional

27  Officer Barron (floor officer of bldg. 3C-01); Correctional Officer Edmonds (floor officer

28  of bldg. 3C-01); Correctional Officer Valdez (facility 3C search and escort); Correctional

1   Officer Swaim (floor office of bldg. 3C-01); Sergeant Correia (facility 3C sergeant);

2   Lieutenant Melo (facility 3C lieutenant); Medical Technical Assistant (MTA) Hernandez

3   (facility 3C MTA); Resident Nurse (RN) Melendez (facility 3C RN); Sergeant  Galaviz

4   (facility 3C sergeant).

5       On Monday, June 20, 2005, at approximately 9:45 AM, in Building 3C-01 of

6   Corcoran Prison, Officer Athey released James from his cell so he could report to the 3C

7   work exchange to be escorted to the Acute Care Hospital for scheduled medical treatment.

8   James was on his way to a physical therapy appointment for his shoulder, which he attended

9   approximately twice per week.  Officer Athey knew James was on his way to a medical

10  appointment.

11      After James exited his cell, Athey observed James was not in compliance with prison

12  grooming standards.  Athey believed James' hair clearly and conspicuously violated prison

13  grooming standards.  On June 20, 2005, Section 3062 of Title 15 of the California Code of

14  Regulations stated: "An inmate's hair shall be clean, neatly styled, and groomed . . . when

15  [he] is away from the immediate area of [his] quarters . . . [and] [a] male inmate's hair shall

16  not be longer than three inches and shall not extend over the eyebrows or below the top of

17  the shirt collar while standing upright."

18      Athey stopped James and informed him that he needed to remove his braids to comply

19  with grooming standards.  James refused and at that point Athey ordered James to return to

20  his cell until she could contact a supervisor to resolve the situation.  James refused Athey's

21  order to return to his cell.  Athey then ordered James to return to his cell for a second time

22  and James again refused.  Athey then requested the assistance of Officer's Edmonds and

23  Barron, who were the floor officers in the area at the time.  Edmonds and Barron approached

24  James and ordered him to return to his cell, which he refused.  Edmonds ordered James to

25  return to his cell three more times, and James refused all three times.  Prior to this incident,

26  Edmonds knew that James had previously received a rules violation report for violence and

27  disobedience stemming from a physical altercation with his cellmate.  James had been

28  sprayed with pepper spray during this incident.

1    After James' last refusal of the Officers' orders, he made a movement that Edmonds

2    interpreted as combative.  Edmonds then dispensed a single two second burst from his state

3    issued OC Pepper Spray into James' face.  After Edmonds sprayed James, Athey sounded

4    her personal alarm and advised staff of the situation by way of the institutional radio.

5    The spray temporarily blinded James and caused him to move in such a way that the

6    officers were convinced that the spray had shocked and disoriented him.  James did not

7    comply with Edmond's request that he go down to the ground, so Edmonds put both hands

8    on James' shirt and pulled James down to a prone position to gain control of him.  James

9    claims Edmonds slammed his head into the ground multiple times.  Edmonds then ordered

10   James to put his hands behind his back and grabbed his right hand and held it behind his

11   back.  Barron grabbed James' left hand to help Edmonds gain control over James.  This was

12   the only physical contact Barron had with James.  Edmonds then put mechanical restraints

13   on James' hands.  At this time, James was approximately 25 yards away from his cell.

14   Officers Swaim and Valdez and Sergeants Correia and Galaviz responded to Athey's

15   alarm.  Edwards informed the responding officers that James had attempted to assault an

16   officer.  The responding officers knew James had been sprayed with pepper spray because

17   of the strong smell of pepper spray in the air.  The Officers involved in James' pepper spray

18   decontamination understood the procedure to be: (1) remove the inmate from the

19   contaminated area; (2) provide the inmate with decontamination with either air or water; (3)

20   take the inmate to the medical clinic for a medical evaluations and treatment of any potential

21   injuries; and (4) provide the inmate additional decontamination if necessary.  According to

22   the CSP-COR Procedure Manual, "[i]f Oleoresin Capsicum [pepper spray] is used on a SHU

23   inmate, the inmate needs to the decontaminated.  Fresh air and/or running water is

24   recommended prior to rehousing the contaminated inmate.  The inmate shall be offered

25   access to fresh water, unless alternate means of decontamination is ordered by a physician.

26   Once sprayed and restrained the inmate will be removed from the area of exposure.  The

27   inmate will be evaluated by the on-site Medical Technical Assistant."

28   Officers Swaim and Valdez relieved Barron and Edmonds of custody over James.

Sergeant Correia ordered Swaim and Valdez to take James to the 3C medical clinic for a medical evaluation. Swaim and Valdez took James outside of the building to get him away from the lingering pepper spray, and to take him to the 3C medical clinic, as ordered by Sgt. Correia. Swaim was familiar with the decontamination instructions on his cannister of OC Pepper Spray. Those instructions said to first remove the sprayed inmate from the contaminated area, then provide the inmate air or water decontamination. Swaim believed it was better to remove James from the contaminated area by taking him outside the building because there was a lingering residue of pepper spray in the building and the exit was nearby. When Swaim and Valdez took James outside, James began to complain that his eyes were burning and he needed medical attention. James remained outside decontaminating with fresh air anywhere from five to thirty minutes.

After allowing him to decontaminate with air, Swaim and Valdez then escorted James to the 3C medica building for a medical evaluation. Swaim does not remember James ever saying he had front-cuff chrono. However, if James had told him, Swaim stated he would not have acted differently because Swaim believed that James had just assaulted an officer and he would not have risked removing his handcuffs or cuffing him in the front without an order from a doctor or superior officer to do so.

When they arrived at the 3C medical building, Swaim and Valdez placed James in a holding cell to wait for medical personnel to evaluate and potentially treat him. MTA Hernandez was in the medical clinic at the time. Several prisoners were already in the medical clinic waiting for medical treatment before James got there. At some point, while he was in the holding cell in the clinic, James complained that his eye was burning and he wanted water decontamination.

Swaim and Valdez removed James from the holding cell and escorted him to the building 3C02 showers for water decontamination. When they arrived at the Building 3C02 showers, Swaim and Valdez put James in the shower and turned on the water for him. According to James, it had been approximately thirty minutes since Edmonds had sprayed him. After two to five minutes, one of the officers removed James' handcuffs so he could

1    decontaminate more easily.

2         After approximately four to ten minutes, James became hysterical and yelled that he

3    was blind and that the officers had maimed him.  He told Swaim and Valdez that he would

4    sue them.  He looked at Swaim's nametag and spelled his name out, letter for letter.  Swaim

5    was standing approximately thirty feet away from James at the time.  James then looked at

6    Valdez's nametag and spelled out his name, letter for letter.  Valdez was standing

7    approximately ten to fifteen feet away from James at the time.

8         Swaim and Valdez ordered James to cuff up, or submit to handcuffs and exit the

9    shower.  James refused to comply.  Instead, he demanded that the officers bring a sergeant

10   and an MTA to the showers.  The officers requested medical assistance from Sergeant

11   Correia and the 3C medical clinic.  Sergeant Correia and MTA Hernandez responded to the

12   3C02 shower.  For at least fifteen minutes, Sergeant Correia attempted to persuade James to

13   cuff up and exit the shower.  James refused Correia's orders.  James complained to MTA

14   Hernandez that he could not see, and she advised him to put his face in the water

15   continuously for four to five minutes.  James contends that his actions were justified because

16   the officers were refusing to give him the medical treatment he demanded.

17        One of the officers requested additional assistance and Sergeant Galaviz responded

18   to the 3C02 shower.  James complained to Galaviz that his head was injured.  Sgt. Galaviz

19   successfully persuaded James to cuff up and exit the shower.  James has been in the shower

20   for more than thirty minutes.  After James exited the shower, Officers Swaim and Valdez

21   escorted him to the holding cell in the program office and provided him with a clean change

22   of clothing.

23        At approximately 11:00 AM, MTA Hernandez evaluated James in the program office.

24   Based on the evaluation, she filled out a 7219 injury form documenting James' condition.

25   She noted the time she performed the evaluation on the form.  Hernandez observed James

26   from outside his holding cell while performing the evaluation, and she was no more than

27   three feet away from James when she evaluated him.  She noted on the 7219 form that James

28   had been exposed to pepper spray, that he had been decontaminated, and that he had no

1   injuries.  James claims Hernandez falsified the medical report and failed to document his

2   visible injuries.

3       At approximately 1:20 PM that afternoon, Sgt. Galaviz conducted a video interview

4   with James regarding the incident.  During this interview, James requested a pencil and paper

5   so he could file a grievance against the officers who he felt had violated his rights that day.

6       At approximately 1:00 AM on June 21, 2005, James received additional medical

7   treatment on his eye.

8       James did file a grievance, dated June 15, 2005, against Barron, Edmonds, and several

9   other officers concerning events that took place on June 14, 2005.  However, Athey's name

10  was not included in the grievance.  Athey was not at work on Tuesday, June 14, 2005.  On

11  or before June 20, 2005, James did not say anything to any of the defendants in this case

12  indicating that he had filed a grievance against them.  None of the Defendants said anything

13  to James indicating that they knew he had filed a grievance against any of them.

14      By June 20, 2005, James had filed approximately one hundred and forty inmate

15  appeals.  After June 20, 2005, he filed approximately two hundred inmate appeals, three or

16  four of which were related to the events of June 20th.  Before June 20th, officer had pepper

17  sprayed James at least three times.  They sprayed him once in 2000, once in 2003, in April

18  of 2005, and in 2008.

19      Dr. Igbinosa, Medical Director and Pleasant Valley State Prison, reviewed James'

20  medical records and provided a declaration in connection with this suit.  According to Dr.

21  Igbinosa, the officers provided James with medically sufficient decontamination following

22  his exposure to pepper spray on June 20, 2005.  Dr. Igbinosa opined that providing an inmate

23  decontamination with air or water immediately after removing him from the contaminated

24  area is a medically appropriate course of treatment.  If the inmate continues to feel pain and

25  discomfort after receiving open air decontamination, it is medically appropriate for the

26  officers to provide him with water decontamination as well, if practicable to do so.  Dr.

27  Igbinosa also stated that a thirty minute delay in providing an inmate water decontamination

28  does not expose the inmate to an increased risk of injury, especially after he had already been

1   provided air decontamination.

2   **DISCUSSION**

3       A.    **Eighth Amendment Excessive Force Claim Against Officers Barron and Edmonds**

4

5       The unnecessary and wanton infliction of pain violates the Cruel and Unusual

6   Punishments Clause of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5, 112

7   S.Ct. 995, 117 L.Ed.2d 156 (1992) (citations omitted). When a prison security measure is

8   undertaken in response to an incident, the question of whether the measure taken inflicted

9   unnecessary and wanton pain and suffering depends on "whether force was applied in a good

10  faith effort to maintain or restore discipline or maliciously and sadistically for the very

11  purpose of causing harm." *Id.* at 6.

12      The infliction of pain in the course of a prison security measure "does not amount to

13  cruel and unusual punishment simply because it may appear in retrospect that the degree of

14  force authorized or applied was unreasonable, and hence unnecessary." *Whitley v. Albers*,

15  475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *see also Hudson*, 503 U.S. at 1.

16  Prison administrators "should be accorded wide-ranging deference in the adoption and

17  execution of policies and practices that in their judgment are needed to preserve internal

18  order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321–322

19  (*quoting Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1970)).

20      Moreover, not "every malevolent touch by a prison guard gives rise to a federal cause

21  of action," *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of cruel and

22  unusual punishments necessarily excludes from constitutional recognition de minimis uses

23  of physical force, provided that the use of force is not of a sort 'repugnant to the conscience

24  of mankind.' " *Id.* at 9–10 (internal quotations marks and citations omitted). Although de

25  minimis uses of force do not violate the Constitution, the malicious and sadistic use of force

26  to caused harm always violates the Eighth Amendment. *Id.*; *see also Oliver v. Keller*, 289

27  F.3d 623, 628 (9th Cir.2002) (Eighth Amendment excessive force standard examines de

28  minimis uses of force, not de minimis injuries)).

1        Factors such as the need for the application of force, the relationship between the need

2   and amount of force that was used, and the extent of injury inflicted are relevant to the

3   ultimate determination as to whether force used by prison personnel was excessive. From

4   these factors, inferences may be drawn as to whether the use of force could plausibly have

5   been thought necessary, or instead evinced such wantonness with respect to the unjustified

6   infliction of harm as is tantamount to a knowing willingness that it occur. "Equally relevant

7   are such factors as the extent of the threat to the safety of staff and inmates, as reasonably

8   perceived by the responsible officials on the basis of facts known to them, and any efforts

9   made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

10        The evidence before the Court, construed in the light most favorable to Plaintiff, fails

11   to raise a genuine issue of material fact with respect to his Eighth Amendment excessive

12   force claim against Officers Barron and Edmonds. Here, James has failed to present any

13   evidence at all to support an excessive force claim against Officer Barron. Officer Barron's

14   only physical interaction with James occurred when he assisted Officer Edmonds with

15   putting James' hands behind his back in order to put restraints on him. James makes no

16   allegations nor presents any evidence that Office Barron committed any acts beyond this that

17   would support a jury verdict in this favor. As discussed below, James also fails to raise a

18   triable issue of material fact to support his excessive force claim against Officer Edmonds,

19   therefore, summary judgment for Defendants on this claim is appropriate.

20        Here, James alleges that Officer Edmonds used excessive force against him when

21   spraying him with pepper spray and then forcing him to the ground. Plaintiff does not

22   dispute the facts surrounding the precipitating event—that although Officer Edmonds ordered

23   Plaintiff to return to his cell four times, Plaintiff failed to comply. In addition, Officer

24   Edmonds was aware of the undisputed fact that Plaintiff had previously received a rules

25   violation report for violence and disobedience stemming from a physical altercation with his

26   cellmate. In this context, Officer Edmonds reasonably perceived Plaintiff's actions as

27   threatening, and it was not unreasonable for him to spray Plaintiff with pepper spray. It was

28   equally reasonable for Officer Edmonds to force Plaintiff to the ground immediately

1  following the infliction of pepper spray as part of his efforts to maintain or restore discipline

2  to the situation.  Plaintiff does not attempt to dispute the fact that he failed to comply with

3  the Officers' order, but merely posits that his refusal was justified under the circumstances

4  because Officers did not have a valid reason for ordering him to return to his cell for

5  violating prison grooming standards.

6      In order for an Eighth Amendment excessive force case to go to the jury, the evidence

7  must go "beyond a mere dispute over the reasonableness of a particular use of force or the

8  existence of arguably superior alternatives" to support "a reliable inference of wantonness

9  in the infliction of pain."  *Whitley*, 475 U.S. at 322.  Here, in addition to the undisputed fact

10  that Plaintiff refused to comply with the Officers' orders, Defendants have presented

11  evidence that Plaintiff was involved in at least three other altercations that required the use

12  of pepper spray.  Plaintiff does not dispute this fact.  Officers Edmonds was aware of at least

13  one of the previous pepper spray incidents at the time of the June 20, 2005 incident.  Here,

14  a jury could not reasonably conclude that Officer Edmonds' application of force was

15  unnecessarily excessive under the circumstances and not undertaken in a good faith effort

16  to restore discipline and order.  Thus, summary judgment is appropriate.

17

18

19

20      **B.    First Amendment Retaliation Claim Against Officers Athey, Barron, and Edmonds**

21

22      Allegations of retaliation against a prisoner's First Amendment rights to speech or to

23  petition the government may support a § 1983 claim. *Rizzo v. Dawson*, 778 F.2d 527, 532

24  (9th Cir.1985); *see also Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir.1989); *Pratt v.

25  Rowland*, 65 F.3d 802, 807 (9th Cir.1995). "Within the prison context, a viable claim of First

26  Amendment retaliation entails five basic elements: (1) An assertion that a state actor took

27  some adverse action against an inmate (2) because of (3) that prisoner's protected conduct,

28  and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5)

1  the action did not reasonably advance a legitimate correctional goal ." *Rhodes v. Robinson*,

2  408 F.3d 559, 567–68 (9th Cir.2005).  In addition, a plaintiff must "show that the protected

3  conduct was a 'substantial' or 'motivating' factor in the defendant's decision. At that point,

4  the burden shifts to the defendant to establish that it would have reached the same decision

5  even in the absence of the protected conduct." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d

6  1310, 1314 (9th Cir.1989).

7       James alleges that Officer Athey stopped him on the way to his physical therapy

8  appointment for violating grooming standards in retaliation for him filing a prisoner

9  grievance a few days beforehand.  However, Defendants' evidence speaks to the contrary.

10  First, the grievance that James had filed a few days for the June 20, 2005 incidents did not

11  include Officer Athey's name anywhere.  This obviated any incentive for Officer Athey to

12  stop James on the way to his appointment.  In addition, James does not dispute that his hair

13  was not in compliance with prison grooming standard at the time Athey stopped him,

14  therefore, James cannot show that Athey's act of stopping him did not advance a legitimate

15  correctional goal.  Accordingly, James' claim against Athey fails and Defendants are entitled

16  to summary judgment with respect to it.

17       James alleges that Officers Barron and Edmonds retaliated against him for filing a

18  grievance against them.  As Defendants highlight in their motion, Officers Barron and

19  Edmonds were called to assist Officer Athey after James had refused to follow her orders to

20  return to his cell.  Barron and Edmonds' involvement in the situation was a direct result of

21  James' noncompliance.  Furthermore, any use of force exhibited by Barron and Edmonds

22  was warranted based on James' refusal to follow their orders and return to his cell.  As

23  discussed above, Defendants' evidence demonstrates that Edmond's act of spraying James

24  with pepper spray served a legitimate correctional goal given James' refusal to comply with

25  multiple orders to return to his cell and in light of his previous involvement in altercations

26  that required officers to use pepper spray.  As such, even assuming Barron and Edmonds did

27  have a retaliatory motive, they had a valid reason for their conduct even in the absence of

28  James filing a grievance against them a few days before.  Therefore, the Court grants

Defendants' motion as to all of James' retaliation claims.

**C.    Eighth Amendment Deliberate Indifference to a Serious Medical Need Claim**

James alleges that Officers Swaim, Valdez, Athey, Barron, Correia, Edmonds Melo; MTA Hernandez; and RN Melendez violated his Eighth Amendment right to adequate medical care by failing to properly handle his decontamination after being sprayed with pepper spray.

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that the defendant possessed a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991); *McKinney v. Anderson*, 959 F.2d 853 (9th Cir.1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 4, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *See, e.g., Wood v. Housewright*, 900 F.2d 1332, 1337–41 (9th Cir.1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir.1989). *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992), *overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc).

In *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish

1     "deliberate indifference." Of course, negligence is insufficient. *Farmer*, 511 U.S. at 835, 114

2     S.Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably

3     high risk of harm which is so obvious that it should be known) is insufficient. *Id.* at 836–37,

4     114 S.Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the

5     risk or that a defendant should have known of the risk. *Id.* at 842, 114 S.Ct. at 1981.

6         A prison official acts with "deliberate indifference ... only if the [prison official]

7     knows of and disregards an excessive risk to inmate health and safety." *Gibson v. County of*

8     *Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir.2002) (citation and internal quotation marks

9     omitted). Under this standard, the prison official must not only "be aware of facts from which

10    the inference could be drawn that a substantial risk of serious harm exists," but that person

11    "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128

12    L.Ed.2d 811 (1994). "If a [prison official] should have been aware of the risk, but was not,

13    then the [official] has not violated the Eighth Amendment, no matter how severe the risk."

14    Gibson, 290 F.3d at 1188 (citation omitted). This "subjective approach" focuses only "on

15    what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839, 114 S.Ct. 1970,

16    128 L.Ed.2d 811. "Mere negligence in diagnosing or treating a medical condition, without

17    more, does not violate a prisoner's Eighth Amendment rights." *McGuckin*, 974 F.2d at 1059

18    (alteration and citation omitted).

19        Additionally, mere delay in medical treatment without more is insufficient to state a

20    claim of deliberate medical indifference. *Shapley v. Nevada Bd. of State Prison Com'rs*, 766

21    F.2d 404, 408 (9th Cir.1985). Although the delay in medical treatment must be harmful, there

22    is no requirement that the delay cause "substantial" harm. *McGuckin*, 974 F.2d at 1060,

23    citing *Wood v. Housewright*, 900 F.2d 1332, 1339–1340 (9th Cir.1990) and *Hudson*, 112

24    S.Ct. at 998–1000. A finding that an inmate was seriously harmed by the defendant's action

25    or inaction tends to provide additional support for a claim of deliberate indifference;

26    however, it does not end the inquiry. *McGuckin*, 974 F.2d 1050, 1060 (9th Cir.1992). In

27    summary, "the more serious the medical needs of the prisoner, and the more unwarranted the

28    defendant's actions in light of those needs, the more likely it is that a plaintiff has established

1    deliberate indifference on the part of the defendant." *McGuckin*, 974 F.2d at 1061.

2         Superimposed on these Eighth Amendment standards is the fact that in cases

3    involving complex medical issues where plaintiff contests the type of treatment he received,

4    expert opinion will almost always be necessary to establish the necessary level of deliberate

5    indifference. *Hutchinson v. United States*, 838 F.2d 390 (9th Cir.1988). Thus, although there

6    may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that

7    the treatment he received equated with deliberate indifference thereby creating a material

8    issue of fact, summary judgment should be entered for the defendant. The dispositive

9    question on this summary judgment motion is ultimately not what was the most appropriate

10   course of treatment for plaintiff, but whether the failure to timely give a certain type of

11   treatment constituted deliberate indifference.

12        This Court, in analyzing James' claim, is cognizant that pepper-spraying "[o]rdinarily

13   ... does not create a serious medical need because it causes only temporary discomfort."

14   *Heilman v. Fry*, No. CV–08–2478–JLQ, 2009 WL 3287734, at *5 (E.D.Cal.2009); *cf. Britton*

15   *v. Lowndes County Sheriff's Dept.*, No. 1:04 CV 160–P–D, 2005 WL 311525, at *5

16   (M.D.Miss.2006) ("the nature of pepper spray is to cause pain that dissipates without causing

17   serious injury") (action by pretrial detainee, not prisoner).  Moreover, the failure to treat the

18   effects of pepper spray suffered by an inmate for over an hour has been determined not to be

19   a constitutional violation. *Gibson v. Woodford*, 2010 U.S. Dist. LEXIS 12979, 11–12

20   (E.D.Cal. Feb. 12, 2010). The Court held, "On the facts of this case, this relatively brief delay

21   did not amount to deliberate indifference ... [.] Similar or longer delays are often encountered

22   in emergency rooms across the country under comparable circumstances." *Id. Provencia v.*

23   *Vazquez,* No. 1:07–CV–00069 AWIJLT, 2010 WL 2490937, at *9 (E.D.Cal.2010).

24        Viewing the facts in the light most favorable to the nonmoving party, Plaintiff has not

25   shown evidence that precludes summary judgment.  Even assuming that the effects of pepper

26   spray result in a "serious medical need," Plaintiff fails to present any evidence that

27   defendants possessed the requisite state of mind for deliberate indifference.  At best, all

28   Plaintiff can show is that the decontamination process did not happen as quickly as he would

1   have liked, not that he was denied decontamination altogether or that the decontamination

2   provided resulted in serious injury.  The undisputed facts are that James was (1) removed

3   from the contaminated area after being sprayed; (2) placed outside around fresh air for a

4   period of time of at most 30 minutes; (3) taken to the medical clinic and placed in a holding

5   cell while other inmates were being treated; (4) taken to the showers for water

6   decontamination and allowed to stay in the shower for over 30 minutes; and (5) received

7   additional medical treatment the following day.  Furthermore, Plaintiff has presented no

8   evidence to dispute Defendants' contention that any discomfort was only a de minimis injury,

9   typical of the temporary discomfort caused by pepper spray.  The fact that defendants

10  removed Plaintiff from the contaminated area, escorted him to the medical clinic, and then

11  allowed water decontamination, indicates that they were aware of the conditions Plaintiff

12  faced and took steps to prevent unnecessary injury.  All defendants named in this claim

13  participated in James' decontamination process at various stages.  As stated in their various

14  affidavits, they were aware of the protocol for providing decontamination and the undisputed

15  facts show that their actions comported with the established practice of the prison.  In sum,

16  Plaintiff provides no evidence to infer that Defendants knew that he faced a substantial risk

17  of harm and disregarded that risk by failing to take reasonable steps to abate it.  *Farmer*, 511

18  U.S. at 837.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's claim

19  of deliberate indifference is granted.

20  **D.    Qualified Immunity**

21         As an alternative grounds to avoid liability, Defendants assert that they are entitled

22  to summary judgment on qualified immunity grounds.  Given that the Court has decided

23  Plaintiff's claims on the merits, a prolonged discussion of qualified immunity is unnecessary.

24  There is no need to consider the defense of qualified immunity with respect to the claims that

25  the Court has resolved in Defendants favor on summary judgment. *Wilkie v. Robbins*, 551

26  U.S. 537, 567, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007).

27         Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary

28  Judgment (Doc. 92) is **granted**.

1    **IT IS FURTHER ORDERED** that all pending motions remaining on the docket are

2  **denied as moot**.

3    **IT IS FURTHER ORDERED** that Clerk of the Court shall enter judgment for

4  Defendants and close this case.

5    DATED this 26th day of August, 2011.

6

7

8    _____
                    Raner C. Collins
9                   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -